**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

**UNITED STATES OF AMERICA**                **CRIMINAL ACTION**

**VERSUS**                                  **NO. 25-88**

**LUCINTO FUENTES**                         **SECTION: "P" (5)**

## ORDER AND REASONS

Before the Court is the Government's Motion to Stay Release and Revoke Magistrate Judge's Release Order (R. Doc. 77), the Memorandum in Support of Government's Motion to Revoke Magistrate Judge's Release Order (R. Doc. 73), and Defendant's Response in Opposition to the Government's Motion to Revoke Magistrate Judge's Release Order (R. Doc. 78). For the reasons that follow, **IT IS ORDERED** that the Government's motion to revoke the magistrate judge's release order is **DENIED**.

### I.    BACKGROUND

The background relevant to Mr. Fuentes's release was detailed in this Court's recent Order and Reasons,[1] so the Court provides only a summary of that background here. A little over one year ago, in March 2025, Defendant Lucito Fuentes was named in a criminal complaint for being a felon in possession of a firearm and an illegal alien in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and (5).[2] According to the complaint, Louisiana State Police patrolling near the Bacchus Mardi Gras parade in New Orleans observed Mr. Fuentes holding the handle of a firearm tucked into the waistband of his pants.[3] After conducting a stop-and-frisk, a computer inquiry revealed that Mr. Fuentes had been convicted of simple burglary, a felony under state law.[4]

---

[1] R. Doc. 70 at 1–4.
[2] R. Doc. 1.
[3] *Id.* at 2–3.
[4] *Id.* at 4.

Record checks also indicated that Mr. Fuentes was a Belizean national "illegally present" in the United States.[5]

Shortly after Mr. Fuentes's arrest, the presiding criminal duty magistrate judge held a detention hearing, at which Mr. Fuentes stipulated to detention but reserved his right to reopen the issue of pretrial detention should circumstances permit.[6] Roughly one year later, Mr. Fuentes filed a motion to reopen the issue of detention and for an order of release on conditions of bond because the circumstances surrounding his underlying felony conviction and immigration hold had changed.[7] The magistrate judge then held a hearing on the motion.[8] The hearing included testimony from an agent with Homeland Security Investigations, a United States Probation Officer, and Mr. Fuentes's mother.[9] The motion to reopen detention and request for bond were granted, and Mr. Fuentes was released on a $5,000 unsecured appearance bond.[10] Mr. Fuentes's release was subject to certain conditions, including that he be placed in the third-party custody of his mother, Jessy Arzu; submit to supervision by U.S. Probation; engage in an educational or vocational training program; not obtain a passport or any international travel document; restrict his travel to the Eastern District of Louisiana; participate in mental health treatment as directed by U.S. Probation; not possess a firearm or any other dangerous weapon; not use or unlawfully possess any controlled substances or narcotic drugs; submit to drug testing as required by U.S. Probation; and report all contact with law enforcement to U.S. Probation.[11]

---

[5] *Id.*
[6] R. Docs. 15, 16.
[7] R. Doc. 42.
[8] R. Doc. 59.
[9] Tr. 2. The transcript of the reopened detention hearing before the magistrate judge is Record Document 69 on the docket.
[10] R. Docs. 59, 59-1.
[11] R. Doc. 61; *see also* Tr. 112–13.

Three days later, the Government filed an emergency motion to stay Mr. Fuentes's release pending its "appeal" of the magistrate judge's release order.[12] After his release, Mr. Fuentes was detained by U.S. Immigration and Customs Enforcement and placed in removal proceedings.[13] The same day the Government filed its emergency motion, the undersigned temporarily stayed Mr. Fuentes's release and ordered that Mr. Fuentes be returned to the custody of the U.S. Marshal.[14] Two days after issuing the stay, the Court heard oral argument on the Government's motion.[15] One week after oral argument, the Court issued an Order and Reasons denying the Government's motion and ordering that Mr. Fuentes be released pursuant to the magistrate judge's release order.[16]

In its motion to stay, the Government also requested that the Court set an expedited briefing schedule for the Government to "appeal" Mr. Fuentes's bond pending trial.[17] At oral argument and in its Order and Reasons, the Court provided the parties with deadlines to file the appropriate briefing.[18] Pursuant to those deadlines, the Government filed its memorandum in support of its motion to revoke the magistrate judge's release order on April 10, 2026,[19] and Mr. Fuentes filed a response on April 13, 2026.[20] The Government did not file a reply.

During oral argument, the Government indicated that it intended to introduce new evidence on its "appeal" of the magistrate judge's release order, so the Court set a *de novo* hearing for April 15, 2026.[21] In its memorandum in support, however, the Government informed the Court that it did "not intend to provide any additional evidence to the Court that it did not present to the

---

[12] R. Doc. 54.
[13] *Id.* at 3.
[14] R. Docs. 30, 31.
[15]  R. Doc. 65.
[16] R. Doc. 70 at 20–21.
[17] R. Doc. 54 at 3.
[18] R. Doc. 70 at 21.
[19] R. Doc. 73.
[20] R. Doc. 78.
[21] R. Doc. 71.

Magistrate Judge."[22] In his response, Mr. Fuentes, noting the Government's change in position, suggested that the Court need not move forward with the hearing.[23] Accordingly, the Court canceled the *de novo* hearing and, instead, considered, *de novo*, only the evidence and testimony introduced at the hearing before the magistrate judge.[24]

## II.    LEGAL STANDARD: BAIL REFORM ACT

### A.  Standard for Detention or Release

The Bail Reform Act governs whether a criminal defendant awaiting trial should be released or detained.[25] Under the Bail Reform Act, a judicial officer must order a defendant's pretrial release unless the officer determines that the defendant poses either a "flight risk" or a danger to the community.[26] Put differently, the Act permits detention only when no "condition or combination of conditions . . . will reasonably assure the defendant's appearance and the safety of any other person and the community."[27] When release is appropriate, it must be subject to the least restrictive condition or combination of conditions that will provide those reasonable assurances.[28]

"[I]n determining whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community," the court must consider four factors set forth in the Act: (1) "the nature and circumstances of the offense charged, including whether the offense involves" a firearm; (2) "the weight of the evidence against the person"; (3) "the history and characteristics of the person"; and (4) "the nature and

---

[22] R. Doc. 73 at 12.
[23] R. Doc. 78 at 2.
[24] R. Doc. 79.
[25] 18 U.S.C. § 3141(a).
[26] *Id.* § 3142(b); *United States v. Baltazar-Sebastian*, 990 F.3d 939, 944 (5th Cir. 2021).
[27] 18 U.S.C. § 3142(e)(1).
[28] *Id.* § 3142(c)(1)(B).

seriousness of the danger to any person or the community that would be posed by the person's release."[29]

### B. Review of the Magistrate Judge's Release Order

Under the BRA, when a defendant is ordered released by a magistrate judge, an attorney for the Government may file a motion for revocation of the release order with the court having original jurisdiction over the offense.[30] When the district court acts on a motion to revoke a magistrate judge's pretrial detention order, the district court acts *de novo* and "must make an independent determination of the proper pretrial detention or conditions for release."[31] In making this determination, "[t]he district court has discretion in determining whether to conduct a supplementary evidentiary hearing as part of its de novo review."[32] Where a supplementary evidentiary hearing is not held, review of the record of the proceedings before the magistrate judge is appropriate.[33]

### III.    DISCUSSION

Although Mr. Fuentes initially stipulated to detention, the magistrate judge later reopened the detention hearing after finding that circumstances bearing on the pretrial release determination had changed. Because the procedural posture below informs the instant motion, the Court first summarizes the procedural proceedings before the magistrate judge. The Court then turns to its

---

[29] *Id.* § 3142(g).
[30] *Id.* § 3145(a)(1).
[31] *United States v. Rueben*, 974 F.2d 580, 585 (5th Cir. 1992) (citing *United States v. Fortna*, 769 F.2d 243, 249 (5th Cir. 1985)); *see also United States v. Thibodeaux*, 663 F.2d 520, 522 (5th Cir. 1981) ("The statutory scheme adopted in [the BRA] confers a responsibility on the district court to reconsider the conditions of release fixed by another judicial officer . . . as unfettered as it would be if the district court were considering whether to amend his own action.").
[32] *United States v. Hensler*, 18 F.3d 936, 1994 WL 83436, at *2 (5th Cir. 1994) (per curiam) (finding that district court complied with its *de novo* obligation under the Bail Reform Act where district court, which did not hold a hearing, "reviewed *de novo* the entire record of the proceedings before the magistrate judge" and movant did not suggest that she wished to submit additional evidence to the court).
[33] *Id.*

independent review under the Bail Reform Act and the question of whether the Government has shown that detention is warranted.

### A.  Proceedings Before the Magistrate Judge

Under the BRA, a detention hearing may be reopened at any time before trial "if the judicial officer finds that information exists that was not known to the movant at the time of hearing and that has a material bearing on the issue" of pretrial detention.[34] That is what happened here.

The magistrate judge held a hearing in March 2025, shortly after Mr. Fuentes was named in the complaint, at which Mr. Fuentes stipulated to detention.[35] Then, nearly a year later, the magistrate judge reopened the detention hearing on Mr. Fuentes's motion.[36] The magistrate judge found that there was "new information that has a material bearing on the issue of detention."[37] Namely, Mr. Fuentes's sole felony conviction had been reduced to a misdemeanor, which, in addition to eliminating his classification as a "felon," reduced his Pretrial Release Assessment score and decreased his sentencing exposure.[38] His immigration and reentry status also appeared to have changed.[39] These changes, in the estimation of the magistrate judge, made it less likely that Mr. Fuentes would flee and pose a danger to the community.[40] The magistrate judge also reasoned that "Mr. Fuentes deserve[d] an actual hearing because he stipulated [to detention] in the first instance . . . ."[41] The magistrate judge then held an evidentiary hearing and made her findings.

---

[34] 18 U.S.C. § 3142(f).

[35] R. Doc. 15.

[36] R. Docs. 42, 59. Although the Government opposed Mr. Fuentes's motion to reopen the detention hearing (R. Doc. 46), the Government does not raise the issue of whether the detention hearing should have been reopened before this Court.

[37] Tr. 5:4–5.

[38] Tr. 5:9–19.

[39] Tr. 5:20–23.

[40] Tr. 5:4–25.

[41] Tr. 6:2–5.

### B. The Court's *De Novo* Review Under the Bail Reform Act

When a detention hearing is held under the BRA, the burden rests with the Government to establish that no available condition or combination of conditions can reasonably assure the defendant's appearance and the safety of the community.[42] But the Government does not have to meet its burden as to both prongs for pretrial detention to be imposed on the defendant. That is, "the lack of reasonable assurance of either the defendant's appearance, or the safety of others or the community, is sufficient."[43] In the proceeding before the magistrate judge, the Government sought detention on both grounds,[44] so the Court will proceed by determining whether Mr. Fuentes's release should be revoked on each ground.

### i. Danger to Community

The Court begins by assessing whether the Government has met its burden in proving that "no condition or combination of conditions will reasonably assure the safety of any other person and the community." The BRA specifically requires that the "facts the judicial officer uses to support" this finding "shall be supported by clear and convincing evidence."[45] Accordingly, for detention to be imposed, the Government must prove by clear and convincing evidence that no conditions of release can reasonably assure the safety of the community or any person.[46] This is a high burden.

Much of the Government's evidence presented at the detention hearing before the magistrate judge concerned Mr. Fuentes's non-compliance with his state probation sentence and his immigration status. In fact, at the hearing and in its memorandum in support of the instant

---

[42] *See United States v. Salerno*, 481 U.S. 739, 750 (1987).
[43] *United States v. Rueben*, 974 F.2d 580, 586 (5th Cir. 1992) (first citing *United States v. Hare*, 873 F.2d 796, 799 (5th Cir. 1989); and then citing *United States v. Fortna*, 769 F.2d 243, 249 (5th Cir. 1985)).
[44] Tr. 6:19–23.
[45] 18 U.S.C. § 3142(f).
[46] *Salerno*, 481 U.S. at 750 (citing 18 U.S.C. § 3142(f)).

motion, the Government relies only on three specific incidents to show that Mr. Fuentes is a danger to the community: (1) the circumstances of the instant offense, (2) a recorded jail call in which Mr. Fuentes indicated he would obtain another firearm, and (3) a domestic disturbance call involving Mr. Fuentes. But, without more, these incidents are not sufficient to satisfy the Government's burden under the clear-and-convincing standard and, therefore, cannot support a finding that no conditions of release can reasonably assure the safety of the community.

First, the Government makes much of the nature and circumstances of the instant offense— the first of the four factors a court is to consider under the BRA. The Government also asserts that the weight of the evidence of the offense—the second factor—weighs in favor of detention.[47] According to the complaint, law enforcement officers observed Mr. Fuentes walking through a crowd at Mardi Gras gripping the handle of a handgun that was partially concealed in the waistband of his pants.[48] High school marching bands were, reportedly, marching in the nearby parade.[49] Testimony from the law enforcement agent at the hearing largely corroborates this version of events.[50] The Government argues that this incident poses a high level of danger to the community, "given how the defendant at minimum laxly secured the firearm he possessed and maximum that the defendant intended to use the firearm . . . ."[51] The Government presented no evidence, however, that Mr. Fuentes intended to use the firearm.[52]

The second incident the Government relies on is a phone call Mr. Fuentes made from jail after the arrest for the instant offense.[53] In this phone call, Mr. Fuentes said to a female acquaintance, "They found my sh*t and I don't even worry about my sh*t, because I'm going to

---

[47] R. Doc. 73 at 7.
[48] R. Doc. 1 at 3–4.
[49] *Id.* at 3.
[50] Tr. 9–10.
[51] R. Doc. 73 at 6–7.
[52] Tr. 82:18–21.
[53] R. Doc. 73 at 11.

get another one."[54] According to the Government, this means that Mr. Fuentes planned to procure another firearm.[55] The Government argues that this goes to the "the nature and seriousness of the danger that would be posed" by Mr. Fuentes's release—the fourth BRA factor.[56] Mr. Fuentes argues, and the testifying law enforcement agent conceded, that "my sh*t" could refer to "many different types of objects."[57] Even assuming Mr. Fuentes was expressing his intent to obtain another firearm, which the Court believes is a reasonable way to interpret what Mr. Fuentes said during the jail call, there is no evidence that Mr. Fuentes used, or even planned to use, the firearm recovered during his arrest.[58] Nor does the record show that Mr. Fuentes has ever used, attempted to use, or threatened anyone with a firearm.

Third, at the hearing, the Government raised a domestic disturbance incident involving Mr. Fuentes and his mother, Jessy Arzu.[59] This incident is relevant to Mr. Fuentes's history and characteristics—the third factor under the BRA.[60] In June 2024, Ms. Arzu called the police on Mr. Fuentes because she was scared.[61] But Ms. Arzu was not afraid Mr. Fuentes would injure her; instead, she was afraid because he was "just spiteful."[62] This domestic disturbance call was "out of character" for Mr. Fuentes and appears to have been a one-off incident.[63] And the record does not suggest that Mr. Fuentes has any history of violence.

---

[54] Tr. 18:7–9; R. Doc. 73 at 11.

[55] R. Doc. 73 at 11.

[56] *Id.*; 18 U.S.C. § 3142(g)(4).

[57] R. Doc. 78 at 27; Tr. 55:2–7.

[58] Tr. 82:18–25.

[59] As discussed in the next section, Ms. Arzu is not Mr. Fuentes's biological mother. Although she has never formally adopted Mr. Fuentes, she has cared for him since he was a baby when his biological mother abandoned him. Tr. 88–92. Mr. Fuentes even refers to her as "mom." Tr. 102:14–16.

[60] 18 U.S.C. § 3142(g)(3).

[61] Tr. 102:17–25.

[62] Tr. 103:1–3. According to the transcript, Ms. Arzu said, "Not injure me, he was like—he was just spiteful." Tr. 103:2. But when viewed in context of the Questioner's statements, it appears that Ms. Arzu could have said or meant "disrespectful" instead of "spiteful" (A: "Not injure me, he was like – he was just spiteful." Q: "Ma'am, do you normally call the police on people who are disrespectful to you?" A: "We have – that was my first argument with Jay. . . .").

[63] Tr. 104:25, 105:1–8.

In sum, the Government's evidence that Mr. Fuentes poses such a danger to the community that no conditions of release will reasonably assure the community's safety amounts to three isolated incidents: Mr. Fuentes "laxly" carried a firearm at a Mardi Gras parade; Mr. Fuentes suggested he was going to obtain another firearm while incarcerated for the instant offense; and Mr. Fuentes's mother called the police on him in a one-off incident. While the Court finds each of these incidents concerning, none of the incidents, even when taken as a whole, show that Mr. Fuentes is an "identified and articulable threat" to any individual or the community at large.[64]

The Court acknowledges the concern raised by the circumstances of the offense—loosely carrying a firearm in a crowd—and by Mr. Fuentes's apparent desire to obtain another firearm after his arrest. But possession alone is not evidence of concrete, "demonstrable danger."[65] The record does not show that Mr. Fuentes has ever used a firearm, threatened anyone with one, brandished one, or otherwise employed one in a manner suggesting an identified and articulable threat to another person or the community.[66] The same is true of the domestic disturbance incident. The record reflects that Mr. Fuentes's mother called the police on Mr. Fuentes, but it does not clearly reveal why. It is not apparent whether she did so because she genuinely feared Mr. Fuentes

---

[64] *Id.* at 751 ("When the Government proves by clear and convincing evidence that an arrestee presents an identified and articulable threat to an individual or the community, . . . a court may disable the arrestee from executing that threat.").

[65] *See United States v. Salerno*, 481 U.S. 739, 750 (1987) (explaining that Government's interest in preventing crime is heightened when "the Government musters convincing proof that the arrestee, already indicted or held to answer for a serious crime, presents a demonstrable danger to the community").

[66] *Cf., e.g.*, *United States v. Good*, No. CR 25-196, 2025 WL 2613628, at *6 (E.D. La. Sept. 10, 2025) (finding that nature and circumstances of offense charged weighed in favor of detention where defendant was charged with a crime of violence for assault on a federal officer and faced enhanced penalty because he allegedly inflicted bodily injury on the officer); *United States v. Jubert*, No. 1:23-CR-104-TBM, 2023 WL 5831098, at *3 (S.D. Miss. Sept. 7, 2023) (finding that the nature and circumstances of offense charged supported that Government was likely to be successful in showing that the defendant posed a danger to a prospective witness where the offense charged involved threats on social media with the intent to kill, injure, harass, intimidate another person); *United States v. Salazar-Andujo*, 599 F. Supp. 3d 491, 496 (W.D. Tex. 2022) (finding that defendant accused of dealing firearms without a license and conspiring to smuggle weapons from United States to Mexico show that Government would likely succeed in showing that defendant creates a danger to the community); *United States v. Kent*, 496 F. Supp. 3d 500, 506 (D.D.C. 2020), *aff'd* (Nov. 5, 2020) (finding defendant with loaded firearm on his person while apparently under the influence of a controlled substance posed danger to community).

posed a danger, or whether the call was made for some other reason, such as an effort to manage his behavior or compel compliance.

At bottom, the evidence does not bridge the gap between generalized concern and a concrete showing of dangerousness, and, as discussed in more detail below, the concerns these incidents raise can be mitigated by the conditions of release recommended by the U.S. Probation Office and imposed by the magistrate judge. Thus, pretrial detention based on the BRA's danger-to-community justification is not warranted here.

### ii. Appearance as Required

The Court will now determine whether the Government has met its burden in proving that "no condition or combination of conditions will reasonably assure the appearance of the person as required." Whereas the BRA provides the burden of proof required to demonstrate that the defendant is a danger to an individual or the community, the BRA is silent as to the burden of proof required to demonstrate that the defendant is a "flight risk." The United States Court of Appeals for the Fifth Circuit has applied "the simple preponderance standard," meaning "it is more likely than not that no condition or combination of conditions will reasonably assure the accused's appearance."[67]

The Government's position for detention under the flight-risk justification is stronger than its danger-to-community position, and the burden it must meet is not as onerous. But the Government still falls short of proving that detention is warranted here. The Government poses two principal reasons for why no condition or combination of conditions will reasonably assure Mr. Fuentes's appearance as required: (1) Mr. Fuentes will flee the United States and (2) Mr. Fuentes will fail to appear at future court proceedings. Neither, however, is successful.

---

[67] *United States v. Fortna*, 769 F.2d 243, 250 (5th Cir. 1985) (citations omitted).

First, the Government maintains that Mr. Fuentes is a flight risk because he is a Belizean national with few ties to the United States.[68] The Government alleges that Mr. Fuentes has "no family ties, no employment connections, no long-term residence, and no financial ties to the area that would support a determination of his release on bond."[69] These are all considerations for a court under the  history-and-characteristics factor of the BRA.[70]

The Court recognizes that Mr. Fuentes's connections to the United States may be weaker than those of a United States citizen, but the Court finds they are not as weak as the Government portrays. Starting with Mr. Fuentes's family ties: the record in this case demonstrates that Mr. Fuentes has a unique personal and family history. He was born in Belize, where he was abandoned by his mother as an infant.[71] His mother's neighbor and friend, Jessy Arzu, found him alone, in a dirty diaper, and covered with sores from spider bites, and began taking care of him.[72] She raised Mr. Fuentes as her own child, sending him to school and to the doctor for his continuous childhood health problems.[73] When Mr. Fuentes was a child, Ms. Arzu moved to the United States after she married.[74] She planned to adopt Mr. Fuentes and bring him to this country, but circumstances prevented her from doing so.[75] After Ms. Arzu moved to the United States, Mr. Fuentes longed to be reunited with her while he remained in Belize.[76] The island on which he lived was rife with gang- and drug-related violence.[77] Eventually, Mr. Fuentes, at 15-years-old, traveled to Mexico and then to the United States, on his own, where he voluntarily turned himself into U.S. Border

---

[68] R. Doc. 73 at 9–10.
[69] *Id.*
[70] 18 U.S.C. § 3142(g)(3)(A).
[71] Tr. 88–89.
[72] Tr. 88:1–18.
[73] Tr. 88:12–18, 90:1–2.
[74] Tr. 88:22–25, 91:1.
[75] Tr. 91:2–7.
[76] Tr. 91:8–14.
[77] Tr. 90:7–15.

Patrol.[78] Because he was a minor when he arrived in the United States, he received "special immigrant juvenile status" and was granted deferred deportation status.[79] Nearly since his arrival in the United States and their reunification, Ms. Arzu has continued to care for Mr. Fuentes as his mother. She even refers to Mr. Fuentes as "my son," and Mr. Fuentes goes by "Jay Arzu" and refers to Ms. Arzu as his "mom."[80] Importantly, the Government concedes that Ms. Arzu is a lawful permanent resident of the United States.[81] Thus, the Government's contention that Mr. Fuentes has no family ties to the United States is unconvincing.

Although Ms. Arzu may not be Mr. Fuentes's biological nor legal adoptive mother, the record before the Court shows she is his mother for all intents and purposes. She has raised him as her own, refers to him as her son, and allows him to use her last name. When applying the BRA, a judicial officer must be concerned with realities, not formalities; indeed, the function of the BRA is to predict which defendants pose a real threat to the public and the criminal judicial process.[82] To find that a judicial officer can consider only formal legal relationships would ignore reality in a society that has long recognized that parent-child relationships can exist outside of biology and legal adoption. To that end, the Act refers to family and community "ties"—those relationships that bind a defendant to the community—instead of narrower legal or biological terms. This indicates that courts should consider real familial bonds, not merely formal legal status. Additionally, whatever allegedly weak ties Mr. Fuentes has to the United States, those ties, based on the record before this Court, appear substantially stronger than his ties to Belize, where he

---

[78] Tr. 91:18–24.
[79] Tr. 47:9–25.
[80] Tr. 87:14–21, 102:14–16.
[81] R. Doc. 54 at 2.
[82] *United States v. Salerno*, 481 U.S. 739, 742 (1987) (explaining that the BRA was formulated in response to "the alarming problem of crimes committed by persons on release" (quoting S.Rep. No. 98–225, p. 3 (1983))).

suffered trauma, appears to have no friend or family relationships, and from which he fled to come to the United States.

In making its flight risk determination, the Government also asks the Court to consider deportation alongside the BRA factors. The Government concedes that "risk of involuntary removal does not in itself establish a serious risk that the defendant will flee," but alleges that "the presence of an ICE detaine[r], and threat of potential removal can be considered along with an individual evaluation guided by the factors."[83] The Government cites *United States v. Esquivel-Bataz*, a recent Fifth Circuit opinion.[84] Even under the Government's interpretation of *Esquivel-Bataz*, a court must find that the defendant is a "flight risk" under the BRA factors independent from the existence of an ICE detainer and likelihood of deportation.[85] Where, as here, the defendant is not found to be a flight risk under the BRA factors, the possibility of deportation cannot be the basis for detention. Thus, because of Mr. Fuentes's unique personal and family background, the Court does not find Mr. Fuentes's (attenuated) connections to Belize to be convincing proof that he will flee the United States.

Nevertheless, the BRA factors pose some concerns regarding the reasonable assurance of Mr. Fuentes's appearance at future proceedings. The Government argues that Mr. Fuentes's "disregard of instructions during his prior court involvement," namely his absence during state proceedings, "displays a strong nature of further disregard and non-appearance."[86] After Mr. Fuentes's arrest for simple burglary, Mr. Fuentes failed to appear for court on at least two occasions.[87] Mr. Fuentes attributes his absence to his mental health struggles during that time,

---

[83] R. Doc. 73 at 10.
[84] *Id.* (citing *United States v. Esquivel-Bataz*, 155 F.4th 491 (5th Cir. 2025)).
[85] *Esquivel-Bataz*, 155 F.4th at 493 (concluding that district court did not abuse its discretion in denying illegal alien pretrial release where "the district court properly undertook an individualized evaluation of [the defendant] under the BRA factors and found her to be a flight risk").
[86] R. Doc. 73 at 7–8.
[87] R. Doc. 73-9.

which were worsened by a friend's recent death.[88] According to testimony at the hearing, Mr. Fuentes has since sought treatment and has changed while he has been incarcerated over the last year.[89] Both sides of the argument go to Mr. Fuentes's history and characteristics, namely his "mental condition" and "record concerning court appearances."[90] Though his state probation history raises some concerns, the Court finds, like with the danger-to-community determination, that the concerns regarding Mr. Fuentes's future court appearances can be mitigated by the conditions of release recommended by the U.S. Probation Office and imposed by the magistrate judge. The Court explores this finding in the next section.

### iii.  Conditions of Release

The Court concludes its BRA analysis by assessing whether conditions of release will alleviate the concerns raised above. The Government posits two arguments regarding the effectiveness of conditions on Mr. Fuentes's pretrial release: (1) the appointed third-party custodian is an improper custodian and (2) Mr. Fuentes disregarded the conditions of his state probation sentence. The Court addresses each argument in turn.

First, the Government contends that the appointed third-party custodian is an improper custodian because she is a government witness. One of the conditions of Mr. Fuentes's release is that he be released to a third-party custodian, who, in this case, is his mother, Ms. Arzu.[91] The Government asserts that Ms. Arzu is an improper third-party custodian because she is a witness in Mr. Fuentes's case.[92] According to the Government, "a standard bond condition in nearly every criminal case is for the defendant not to have contact with any witnesses or potential witnesses to

---

[88] R. Doc. 78 at 16.
[89] Tr. 94–95.
[90] 18 U.S.C. § 3142(g)(3)(A).
[91] Tr. 112:12–15.
[92] R. Doc. 73 at 10.

the facts of their criminal case."[93]  The Government alleges that Ms. Arzu will be an important Government witness at trial.[94]

Mr. Fuentes maintains that there are various problems with this argument, one being that a no-contact condition is not a standard bond condition.[95] Indeed, under the BRA, "avoid[ing] all contact . . . with a potential witness who may testify concerning the offense" is a permissive—not mandatory—condition.[96] Additionally, as Mr. Fuentes points out, release conditions can be imposed only to reasonably assure the appearance of the defendant as required and the safety of any other person or the community.[97] Thus, if a proposed no-contact condition is based solely on the fact that a third-party custodian may also be a government witness, the condition is improper under the BRA. Here, there is no evidence of witness tampering nor that Ms. Arzu is in danger. In fact, the Government did not raise this argument until its motion to stay the magistrate judge's release order and has waived the opportunity to put forth new evidence. Finally, any concerns regarding Ms. Arzu's being a government witness can be mitigated by a prohibition on discussing the case. The Government also mentions that Ms. Arzu may be involved in illegal activity surrounding Mr. Fuentes's offense, but the Government has failed to offer any evidence of illegal activity on her part. Thus, the Court finds, contrary to the Government's assertion, that Ms. Arzu is a proper third-party custodian.

Second, the Government raises Mr. Fuentes's non-compliance with his state probation sentence. After Mr. Fuentes was convicted of simple burglary under state law, he was sentenced to

---

[93] *Id.*
[94] *Id.*
[95] R. Doc. 78 at 21.
[96] *Compare* 18 U.S.C. § 3142(b) (mandating that the judicial officer "shall" order the release of the person subject to the conditions that he not commit a crime while released and that he cooperate in the collection of DNA) *with id.* § 3142(c)(1) (listing additional conditions that the judicial officer "may" impose on defendant on release).
[97] *Id.* § 3142(c)(1)(B).

a term of probation.[98] According to the state's narrative report, Mr. Fuentes violated multiple conditions of his probation: he failed to initially report to probation and to maintain contact with his probation officer as required thereafter, tested positive for THC several times, and possessed a firearm, which led to the instant offense.[99] The report also indicates confusion surrounding Mr. Fuentes's address: The Government claims that Mr. Fuentes "gave his probation officer an incorrect address multiple times."[100] Mr. Fuentes asserts that the Government has only pointed to errors in the state paperwork but has not proven that the errors were caused by Mr. Fuentes, either purposely or inadvertently.[101]

Again, Mr. Fuentes's history of non-compliance with state probation troubles the Court, and appropriately so. It is relevant to the Court's assessment under the BRA because it bears on whether Mr. Fuentes is likely to abide by conditions of federal pretrial release, particularly where some of those conditions overlap with terms of his state supervision.[102] Yet, that concern alone is not a sufficient reason to revoke the magistrate judge's release order. The BRA does not authorize detention merely because a defendant has previously failed to comply with supervision conditions. Rather, detention is warranted only if no condition of combination of conditions will reasonably assure Mr. Fuentes's appearance as required or the safety of any other person and the community.[103] Accordingly, Mr. Fuentes's history of noncompliance matters only to the extent it can show that conditions of release in this case would be insufficient to reasonably assure appearance or community safety.

---

[98] R. Doc. 73-5 at 1–2, 10.
[99] R. Doc. 73-10
[100] R. Doc. 73 at 9.
[101] R. Doc. 78 at 13.
[102] *See* 18 U.S.C. § 3142(g)(3).
[103] *Id.* § 3142(e).

Here, Mr. Fuentes's history of noncompliance, including his failure to appear at state court proceedings, does raise concern as to whether his appearance at future court proceedings in this case can be reasonably assured. In particular, Mr. Fuentes failed to appear in state court and failed to report to, and maintain contact with, his probation officer. But those incidents do not show that *no* conditions of release can reasonably assure his appearance at future court proceedings. Specifically, the third-party custodian condition materially lessens this concern. Mr. Fuentes's third-party custodian, Ms. Arzu, appeared at one of Mr. Fuentes's state court proceedings and reported him during his term of state probation.[104] This gives the Court confidence that she will actively monitor Mr. Fuentes's compliance with the conditions of release. Also, some of Mr. Fuentes's noncompliance is attributed to mental health struggles for which he has since received treatment and will continue to receive treatment under the conditions of his pretrial release. Moreover, if Mr. Fuentes fails to comply with the current conditions, more restrictive conditions remain available, including location monitoring.[105] Thus, the Court does not find that his history demonstrates that no condition or combination of conditions will reasonably assure his appearance here.

In sum, the Court finds that the conditions imposed by the magistrate judge serve their purpose of reasonably assuring Mr. Fuentes's appearance as required and the safety of the community while he is out on release. That is, the Government's concerns, while generally valid and duly considered by the Court, do not defeat the BRA's presumption of release. Accordingly, the Court finds that the Government has failed to show by clear and convincing evidence that no condition or combination of conditions will reasonably assure the safety of others and the

---

[104] R. Docs. 73-9 at 1, 73-10 at 2; Tr. 104–05.
[105] *See* 18 U.S.C. § 3142(c)(3) ("The judicial officer may at any time amend the order to impose additional or different conditions of release.").

community and has also failed to show by a preponderance of the evidence that no condition or combination of conditions will reasonably assure the appearance of Mr. Fuentes as required.

### IV.    CONCLUSION

For those reasons, **IT IS ORDERED** that the Government's Motion to Stay Release and Revoke Magistrate Judge's Release Order (R. Doc. 77) is **DENIED**.

New Orleans, Louisiana, this 22nd day of April 2026.

**DARREL JAMES PAPILLION**
**UNITED STATES DISTRICT JUDGE**